UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MELISSA L. ANDERSON, as trustee
for the next of kin of Jeffrey C. Anderson,
deceased,

        Plaintiff,

v.                        **MEMORANDUM OF LAW & ORDER**
                              Civil File No. 19-53 (MJD/BRT)

NAES, Inc.,

        Defendant and Third-Party Plaintiff,

v.

MECHANICAL SYSTEMS, INC.,

        Third-Party Defendant.

Michael A. Bryant, Bradshaw & Bryant PLLC, Counsel for Plaintiff Melissa L. Anderson, as trustee for the next of kin of Jeffrey C. Anderson, deceased.

Scott P. Drawe, Drawe & Maland, Counsel for Defendant and Third-Party Plaintiff NAES, Inc.

Timothy S. Poeschl, Grotefeld Hoffmann, Counsel for Third-Party Defendant Mechanical Systems, Inc.

I.      INTRODUCTION

This matter is before the Court on Third-Party Defendant Mechanical Systems, Inc.'s Motion for Summary Judgment on Defendant and Third-Party Plaintiff NAES Corporation's Third-Party Complaint against Mechanical Systems, Inc. [Docket No. 69] The Court heard oral argument on June 30, 2021.

## II. BACKGROUND

### A. Factual Background

#### 1. The Parties and Plant Layout

Defendant Benson Power, LLC ("Benson Power") owned the Benson Power Plant, an electrical power plant burning biomass fuels ("Plant"). Defendant and Third-Party Plaintiff NAES Corporation ("NAES") operated the Plant. (See generally Complaint.) Decedent Jeffrey Anderson was employed by Third-Party Defendant Mechanical Systems, Inc. ("MSI"), a mechanical contractor. (Id.)

MSI was hired to repair the inlet damper in Baghouse "B" at the Plant. (Poeschl Decl., Ex. 1, Mattingly Dep. 66; Poeschl Decl., Ex. 2, Confined Space Permit.) NAES issued a confined space permit for the work to MSI. (Confined Space Permit.) The work was to be performed in the Baghouse, and there was an aisleway between the Baghouse and the spray dryer absorber ("SDA") known as the Baghouse crossover. (Mattingly Dep. 30-31.) The confined space had two

entry points: one at the top of Baghouse B (the crossover) and one inside Baghouse B on the ground level.  (Id.; Poeschl Decl., Ex. 3, A. Anderson Dep. 69.)

The SDA scrubs the sulfur from the flue gases and Plant discharge before the gas exits the stack.  (Drawe Decl., Ex. B, Myers Dep. 59-61; Second Poeschl Decl., Ex. A, Nieto Report at 9, Figure 1.)  The flue gas leaves the boiler; goes into the SDA, where the sulfur is removed; travels through the crossover duct; and goes into the dirty side of the Baghouse where the particulate matter and ash is removed before the flue gas goes out and up the stack.  (Id.)

MSI's crew working on the Baghouse consisted of Decedent Jeffrey Anderson; his son, Anthony Anderson; and Summer Mattingly.  (Poeschl Decl., Ex. 4, DelVecchio Dep. 54; A. Anderson Dep 12.)  Decedent and Anthony Anderson were both millwright welders and Mattingly was a licensed pipefitter. (A. Anderson Dep. 10, 47; Mattingly Dep. 25.)  Decedent was the crew foreman responsible for supervising the welding project.  (Mattingly Dep. 37-38; DelVecchio Dep. 7, 36-37, 54, 95-96; A. Anderson Dep.12.)  On December 6, 2017, Mattingly's responsibilities included confined space attendant and fire watch. (Mattingly Dep. 68; A. Anderson Dep. 63; Confined Space Permit.)  The confined space attendant is the person who watches the entry point of the confined space,

monitoring the people entering and leaving the confined space, and monitoring the air quality.  (A. Anderson Dep. 63.)  Anthony Anderson was welding in the Baghouse, and he entered the hopper from below, by climbing up, and Mattingly was stationed on the ground on fire watch to watch for the sparks from his welding to make sure that they did not fall down and start a fire.  (Mattingly Dep. 68-69.)

      2.    **The Accident**

On December 6, 2017, Decedent was performing welding work at the Plant welding a damper in the Baghouse of the Plant.  (Compl. ¶ 1.)  While Decedent was standing inside the SDA on the ledge at the base of the SDA, a large chunk of ash fell and hit him, killing him.  (Drawe Decl., Ex. B, Myers Dep. 64-65.)

Immediately before the accident, Anthony Anderson was in the hopper performing welding work, Mattingly was on the ground acting as fire watch and viewing the lower entrance to the confined space, and Decedent told Mattingly that he was going to climb up the ladder from the ground where Mattingly was, enter the Baghouse crossover door, go over to the hopper to watch Anthony Anderson welding from the top of the Baghouse.  (Mattingly Dep. 68-69, 71.)

Thirty seconds later, "it felt like there was a boom and some ash fell." (Mattingly Dep. 69.)

According to Gregory Myers, general manager of the Plant and a NAES employee, there was no reason for Decedent to be in the SDA to perform the assigned work. (Drawe Decl., Ex. B, Myers Dep. 133.) The other two members of the MSI crew concurred. (Mattingly Dep. 32, 67; Drawe Decl., Ex. E, A. Anderson Dep. 98-105, 112.)

### 3. Confined Space Training

On the day of the accident, NAES issued a Confined Space Permit describing the confined space where MSI's work was being performed. The Confined Space Permit identified the space to be entered as "'B' Baghouse." (Confined Space Permit.)

In late January and early February 2017, Decedent completed OSHA 30 training. (Poeschl Decl., Ex. 6.) OSHA 30 training includes training on confined spaces. (Id.; Poeschl Decl., Ex. 7, Perronne Dep. 21.) Decedent completed MSI's annual training program for all employees as well as its annual supervisor/foremen training in 2017. He was also trained on fall protection. (Perronne Dep. 24-26; 43.) MSI also had a confined space policy in place at the

5

time of the accident. (Id. 26-27; Poeschl Decl., Ex. 8, MSI Confined Space Training.) Based on that training, Decedent would have known to remain in the confined space when performing work. (Poeschl Decl., Ex. 3, A. Anderson Dep. 29-30.)

Decedent also received site-specific confined space training at the Plant. (Poeschl Decl., Ex. 7, Perronne Dep. 29; A. Anderson Dep. 19-20; Poeschl Decl., Ex. 9, Benson Contractor Safety Briefing.) However, the training did not address the hazards of the SDA because the SDA was a separate confined space from the Baghouse. (Drawe Decl., Ex. B, Myers Dep. 69; Myers Dep., Ex. 30.)

Anthony Anderson and Mattingly were also trained on confined spaces, including in an OSHA 10 training. (A. Anderson Dep. 15-17; Mattingly Dep. 10-11, 19, 22; Poeschl Decl., Ex. 10, A. Anderson OSHA 10.) Anthony Anderson also completed site-specific training at the Plant that included training on confined spaces. (A. Anderson Dep. 19-20,28; Benson Contractor Safety Briefing.)

Mattingly acted as the confined space attendant on the day of the accident. Mattingly testified that the Baghouse and the SDA were separate confined spaces, the SDA was not within the permit required confined space, and she knew that the MSI crew should not have been in the SDA. (Drawe Decl., Ex. A,

Mattingly Dep. 77-78, 98-99.)  Mattingly testified that if she had been at the door in the crossover and had seen Decedent walk towards the SDA, she would have told him that was not where he should be going.  (Id. 98-99.)

Plaintiff's liability expert, Lawrence Sullivan, testified that, in his opinion, if the crossover entrance had been the only or primary entrance to the Baghouse, Mattingly should have been positioned at the crossover entrance.  (Drawe Decl., Ex. C, Sullivan Dep. 92.)  Furthermore, if she had been positioned at the crossover door, she might have been in a position to see Decedent walk towards the SDA and advise him not to do so.  (Id. 93-96.)

### 4. Purchase Order

The Purchase Order from Benson Power to MSI, which may or may not have applied to the Baghouse repair in question, states:

> INDEMNITY: Seller [MSI] shall indemnify and hold harmless Buyer, Buyer's agent, and their employees, officers, directors, shareholders and agents (collectively, "Buyer indemnitees"), from and against any and all claims, actions, liabilities, damages, losses, costs, and expenses, including attorney's fees and expert witness fees (collectively, "Claims") to the extent caused by the negligent acts and omissions of Seller, Seller's subcontractors or anyone directly or indirectly employed by them or anyone for whose acts they may be liable.  Seller shall also indemnify and hold harmless Buyer indemnitees from and against any and all Claims arising out of any failure of Seller to comply with any applicable law, rule, regulation, order, ordinance, and/or standard in effect as of date of this

7

Purchase Order. To the extent necessary to give full effect to these
indemnitees, Seller expressly waives all immunity and limitation of
liability under any applicable industrial insurance act.

(Poeschl Decl., Ex. 5, Purchase Order ¶ 10.)

The Purchase Order further provided:

INSURANCE: Seller [MSI] shall maintain insurance with minimum
limits as follows . . . . Buyer, Buyer's agent, and their subsidiaries
and affiliates shall be additionally insured on a primary and non-
contributory basis with respect to all [MSI] liability policies. All
Seller [MSI] insurance policies shall include a waiver of subrogation
in favor of Buyer, Buyer's agent, and their subsidiaries and affiliates.
. . .

(Purchase Order ¶ 11.)

### B. Procedural History

On December 18, 2018, Plaintiff Melissa Anderson, as trustee for the next of kin of Decedent, served a Minnesota state court Complaint against NAES and Benson Power asserting negligence. ([Docket No. 1] Notice of Removal ¶ 2.)

On January 9, 2019, NAES and Benson Power removed the matter to this Court based on diversity jurisdiction. [Docket No. 1]

On March 25, 2019, NAES filed a Third-Party Complaint against MSI. [Docket No. 20] The Third-Party Complaint asserts:

MSI was negligent in its operations, including, but not limited to,
negligence in failing to properly train and supervise Jeffrey C.
Anderson in the performance of his job duties.

8

(Third-Party Complaint ("TPC") ¶ 4.)

> In the event that Benson Power and/or NAES are found to be liable to plaintiff in this action, Benson Power and NAES are entitled to contribution from MSI for any and all sums that they may pay or be adjudged to pay plaintiff.

(Id. ¶ 6.)

The TPC also alleges that MSI entered into an agreement agreeing to indemnify and hold harmless Benson Power and NAES for damages "caused by the negligent acts or omissions of MSI" (TPC ¶ 7); "MSI entered into a contract to procure insurance naming Benson Power and NAES as additional insureds on a primary and non-contributory basis" (id. ¶ 8); "MSI entered into a contract under which MSI agreed that any insurance policies procured or maintained by MSI shall include a waiver of subrogation provision in favor of Benson Power and NAES" (id. ¶ 9); and "MSI and its insurer have breached these agreements resulting in damages to Benson Power and NAES" (id. ¶ 10). MSI has asserted a counterclaim against Benson Power and NAES for increased insurance premiums. [Docket No. 24]

On December 6, 2019, based on the parties' stipulation, the Court dismissed all claims against Benson Power. [Docket No. 34]

MSI now seeks summary judgment on all claims asserted against it by NAES.

III. DISCUSSION

    A. **Summary Judgment Standard**

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. Celotex, 477 U.S. at 323. "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

    B. **Negligent Training**

NAES's TPC asserts that "MSI was negligent in its operations, including, but not limited to, negligence in failing to properly train and supervise Jeffrey C. Anderson in the performance of his job duties." (TPC ¶ 4.)

"Minnesota law does not recognize a cause of action for negligent training." Johnson v. Peterson, 734 N.W.2d 275, 277 (Minn. Ct. App. 2007). See also M.L. v. Magnuson, 531 N.W.2d 849, 856 (Minn. Ct. App. 1995); Johnson v. Zimmer, Inc., No. CIV. 02-1328 JRT/FLN, 2004 WL 742038, at *10 (D. Minn. Mar. 31, 2004). Therefore, NAES's claim for negligent training is dismissed.

In its opposition brief, NAES claims that, despite the clear language in the TPC, it is not asserting an independent cause of action for negligent training or negligent supervision. Rather, NAES asserts that it is entitled to contribution and contractual indemnity from MSI based on the vicarious liability of MSI for the negligence of its employees. However, vicarious liability depends on the existence of an underlying tort by an employee, which NAES has failed to show. NAES also appears to argue that MSI negligently trained Mattingly; however, even if Minnesota did recognize a tort of negligent training, there is no evidence that MSI's training of Decedent or Mattingly was negligent.

"The basic elements for negligence claim are (1) duty; (2) breach of that duty; (3) that the breach of duty be the proximate cause of plaintiff's injury; and (4) that plaintiff did in fact suffer injury." Schweich v. Ziegler, Inc., 463 N.W.2d 722, 729 (Minn. 1990).

NAES's expert testified that he had no evidence that Decedent was not trained correctly. (Poeschl Decl., Ex. 11, Nieto Dep. 43-44.) When asked, he offered no opinion or evidence that MSI had done anything wrong. (Id.) Nor did Plaintiff's expert testify that MSI's training was inadequate. (Second Poeschl Decl., Ex. B, Sullivan Dep. 111-12.) NAES points to no expert opinion that Mattingly was not trained correctly. The only evidence in the record is that both Decedent and Mattingly received confined space training before the day of the accident. The fact that MSI's training was different from the training provided by Mattingly's previous employer, Fagen, does not create a genuine issue of material fact that MSI's training was inadequate, particularly when the substance of the training was the same. NAES fails to identify any inadequacy in the training they received or any particular additional training that should have been provided. NAES has pointed to no evidence that MSI's training fell below the standard of care.

Additionally, there is no evidence to support NAES's argument that Mattingly was positioned in the wrong place at the time of the accident. Plaintiff's expert and Theodore Perronne testified that Mattingly should have been in position to observe an entrance to the confined space, which she was, and

Plaintiff's expert opined that, if the crossover door was the only or primary access to the confined space, which it was not, Mattingly should have been positioned at the crossover entrance; neither testified that she needed to be at the crossover entrance given that there were two entrances to the confined space. (See Drawe Decl., Ex. C, Sullivan Dep. 73-78; Drawe Decl., Ex. D, Perronne Dep. 78-79, 92.) Mattingly was supposed to be viewing an entrance to the confined space, and she was viewing an entrance to the confined space; it just happened that there were two entrances to the confined space. The evidence in the record is that she was viewing the entrance that the crew was using and, also, was in the position needed to perform fire watch. There is no evidence to support a claim that she was negligent.

The Court grants summary judgment on the negligent training claim.

### C. Negligent Supervision

NAES's Third-Party Complaint asserts that "MSI was negligent in its operations, including, but not limited to, negligence in failing to . . . supervise Jeffrey C. Anderson in the performance of his job duties." (TPC ¶ 4.)

"[N]egligent supervision is the failure of the employer to exercise ordinary care in supervising the employment relationship, so as to prevent the foreseeable misconduct of an employee from causing harm to other employees or third

13

persons." M.L. v. Magnuson, 531 N.W.2d 849, 858 (Minn. Ct. App. 1995) (citation omitted). "The duty imposed is unambiguously limited to preventing an employee from inflicting personal injury upon a third person on the master's premises or inflicting bodily harm by use of the employee's chattels." Mandy v. Minn. Min. & Mfg., 940 F. Supp. 1463, 1471 (D. Minn. 1996) (citing Semrad v. Edina Realty, Inc., 493 N.W.2d 528, 534 (Minn. 1992)). The plaintiff must establish that the employee's misconduct that caused harm to others was foreseeable. Olson v. First Church of Nazarene, 661 N.W.2d 254, 264-65 (Minn. Ct. App. 2002).

The Court grants summary judgment on the negligent supervision claim because NAES points to no evidence that MSI negligently supervised Decedent or Mattingly. (Nor is it clear that a negligent supervision claim could exist for the supervision of Decedent when Decedent's alleged misconduct only caused harm to himself.) There is no evidence that MSI failed to enforce its confined spaces training or was aware that its employees failed to follow the confined space policy. NAES's sole argument is that Mattingly should have been posted at the crossover entrance to the Baghouse where she would have seen Decedent go left into the SDA where he should not have gone. However, the testimony

cited by NAES from experts and lay witnesses only supports the proposition that Mattingly should have been stationed at an entrance to the confined area, which she was. There is no evidence to support the conclusion that when there are two entrances, which there were in this case, Mattingly should have been at the crossover entrance as opposed to the other entrance. Additionally, it is illogical to claim that Mattingly negligently supervised Decedent when Decedent was the supervisor who supervised Mattingly during MSI's work in Baghouse B and told her to position herself at the bottom entrance while he climbed up. There is no evidence that it was unreasonable for MSI to decide to place a confined space attendant at that entrance as a fire watch to ensure nobody entered the Baghouse while the welding work was being performed.

### D. Contractual Claims

NAES argues that it asserts three claims for relief from MSI: (1) contractual indemnity for the negligence of MSI; (2) insurance coverage, attorneys' fees, and other defense costs incurred in defending this action; and (3) for enforcement of the waiver of subrogation provision in the contract between NAES and MSI.

1. **Contractual Indemnity**

Assuming without deciding that the Purchase Order applies to NAES and MSI in this case, the Court concludes that MSI is entitled to summary judgment on the negligence claim. The Purchase Order only requires MSI to indemnify NAES for damages "to the extent caused by the negligent acts or omissions of [MSI]." (Purchase Order ¶ 10.) See also Minn. Stat. § 337.02. Because MSI is entitled to summary judgment on the negligent training and negligent supervision claims and NAES points to no evidence of any other negligence by MSI, as a matter of law, MSI has no obligation to indemnify NAES.

2. **Agreement to Insure**

As for the claim that MSI breached its promise to name NAES as additional insured on its insurance policies resulting in damages through failure to defend and indemnify NAES in this lawsuit for NAES's alleged negligence, the Purchase Order provides that MSI must maintain worker's compensation, commercial general liability insurance, business automobile insurance, and excess liability coverage with particular limits, and "Buyer, Buyer's agent, and their subsidiaries and affiliates shall be additionally insured on a primary and

non-contributory basis with respect to all Seller liability policies." (Purchase Order ¶ 11.)

"The [Minnesota] legislature has established a narrow exception to the general prohibition of indemnification from the indemnitee's own negligence. Section 337.02 'do[es] not affect the validity of agreements whereby a promisor agrees to provide specific insurance coverage for the benefit of others.' Minn. Stat. § 337.05, subd. 1 (1994)." Katzner v. Kelleher Const., 545 N.W.2d 378, 381 (Minn. 1996). The statute further provides:

> If:
>
> (a) a promisor agrees to provide specific types and limits of insurance; and
>
> (b) a claim arises within the scope of the specified insurance; and
>
> (c) the promisor did not obtain and keep in force the specified insurance;
>
> then, as to that claim and regardless of section 337.02, the promisee shall have indemnification from the promisor to the same extent as the specified insurance.

Minn. Stat. § 337.05, subd. 2.

To apply, the language of the promise to insure the negligent party for its own negligent acts must "clearly and unequivocally shift[] liability for all such

claims from [NAES] to [MSI]." <u>Katzner</u>, 545 N.W.2d at 382. Moreover, "the rule is clear that when the meaning of an agreement is uncertain all doubts and ambiguities must be resolved against the one who prepared it." <u>Katzner</u>, 545 N.W.2d at 382 (citation omitted). Here, the Purchase Order language does not clearly require MSI to purchase insurance providing coverage for NAES for claims arising out of NAES's own negligent acts, as opposed to only protecting NAES from claims arising out MSI's negligent acts. <u>See id.</u> (finding contractual language did not require contractor "to purchase insurance for claims arising out of builder's "operations, [] acts or [] omissions" but, rather, was "intended to protect [builder] from claims arising out of the activities of [contractors] and any subcontractors or employees working 'downstream' from them"). <u>Cf. Eng'g & Const. Innovations, Inc. v. L.H. Bolduc Co.</u>, 825 N.W.2d 695, 707-10 (Minn. 2013) (interpreting additional insured endorsement naming contractor as additional insured to provide coverage to contractor only in instances of contractor's vicarious liability for subcontractor's negligent acts or omissions). Therefore, MSI is entitled to summary judgment on the claim that it breached an agreement to provide insurance for NAES to defend and indemnify NAES for its own negligence.

### 3. Waiver of Subrogation

Finally, with regard to the waiver of subrogation issue, the Purchase Order provides: "All [MSI] insurance policies shall include a waiver of subrogation in favor of Buyer, Buyer's agent, and their subsidiaries and affiliates." (Purchase Order ¶ 11.) To the extent that NAES is claiming that MSI should have required its insurer to agree to a waiver of subrogation so that the insurer will not, in the future, sue NAES to recover damages, attorneys' fees and costs, this allegation appears to be a possible defense to MSI's counterclaim against NAES for increased premiums and possible costs or attorney's fees [Docket No. 24] or to an inchoate future lawsuit by MSI's insurer rather than an actual ripe claim asserted against MSI.

Accordingly, based upon the files, records, and proceedings herein**, IT IS HEREBY ORDERED**:

> Third-Party Defendant Mechanical Systems, Inc.'s Motion for Summary Judgment on Defendant and Third-Party Plaintiff NAES Corporation's Third-Party Complaint against Mechanical Systems, Inc. [Docket No. 69] is **GRANTED**.

Dated:  July 6, 2021                     s/Michael J. Davis                    
                                                          Michael J. Davis
                                                          United States District Court